May it please the Court, Michael Braun on behalf of the appellants and plaintiffs, and with me my colleague Matthew Zevin. And with the Court's permission, I'd like to reserve three minutes for rebuttal time. You certainly may. Just watch the clock. Thank you. Chase Bank maintains a program called Adverse Action Repricing, whereby they take a customer's credit report, they scour it for specific events, and based on finding those events, triggers penalty pricing of their APR. Chase does not disclose the existence of this Adverse Action Repricing program, nor do they disclose the specific events that lead to or trigger repricing, nor do they disclose to the consumer that they'll take their credit report and they'll look at it for these specific issues. The question on this appeal, whether Chase's failure to do this, is a violation of TILA, and we submit that it is. The Bars had an 8.99% APR with Chase. In a period of one month over one billing cycle, that APR rose to 24.74%, nearly triple. The Bars saw this, they contacted Chase, and they said, why did this occur? And Chase sent them a letter and said, well, we reviewed your credit report, and we concluded that based upon your credit-to-debt ratio and the fact that you opened up too many lines of credit that you're going to have a new interest rate. And that was it. Immediately thereafter, well, two months thereafter, the Bars closed their Chase account by paying it off incomplete. What assurances had Chase given the bearers that they had a continuing entitlement to the 8.99%? There's no assurances that there's a continuing entitlement to any term in that agreement. You know, part of the obligation under TILA is not prescriptive. It doesn't say you have to regulate in a certain way. It says you just have to disclose. And the bottom line is Chase ultimately had the ability, if it wanted, to change that 8.99% or any other term ultimately by following the rules under TILA. They didn't. What happened was they had this plan in place. It existed. It was part of the terms and conditions of their card number agreement, and they didn't reveal it. They didn't disclose it. And that's the violation. They did have a provision that said that Chase could or might give notice and tell you something and change the terms of the agreement, which they did. There was a change in terms. Absolutely. And Chase routinely changed the terms of the agreement, and they're allowed to under a change in term policy, which is under 226.9. But there's a fundamental difference here. The key here is under TILA, and every court that looks at TILA agrees with this proposition, the fundamental proposition is that you have to disclose terms as they currently exist. It's part of our free market economy. You disclose all the terms that exist, you go out and you compete on those terms. And what Chase didn't do is at the time, the card member agreement at the time that existed, had this policy in place. Chase pulled their credit, looked for specific events, and said, aha, you violated this policy and now we're going to increase your credit. It's fundamentally different than issuing a change in terms later down the road, saying we're just going to issue a new APR. Moreover, even if you want to look at that change in terms down the road, what would they have to do besides revealing that there's an APR increase? Well, if you do have this policy of adverse action repricing where there are specific events, you just have to disclose it. And let's – That's why I asked what entitlement they had. Because I read the Rossman opinion from the Third Circuit. There the court was – very carefully went to the fact that this – that they were guaranteed sort of an annual – they were guaranteed an annual rate. And in one of our prior decisions, we had – we had the guarantee of, you know, of at least one year at zero fees. Right. And so if – but you don't seem to have that kind of a promise. You don't seem to have an advertisement that said, you know, low, 18 – you know, 8.99 annual rate, and therefore suggesting that you were entitled to that for at least one annum. I think the distinction between those cases – there's definitely an analogy, but there's a distinction. You can't focus on the fact that there's simply an affirmative representation in the conflict and limit your understanding of TILA to that event. What you have to do is say, was there a full disclosure? Take Rossman, for example. The lower court in Rossman concluded that the fact that – that in three months Fleet Bank was going to announce a new – a new rate was not a violation of TILA because at the time they made the initial disclosure, they had. And the Third Circuit overruled it. But take our case here. At the time that Chase made the card member agreement, gave the card member agreement to the bars, they failed to disclose the existence of a program that they had in place. Now, when you say failed to disclose, do you mean failed to disclose with clear and conspicuous language or what? Failed to disclose, period. There was no – this is not even an issue of clarity. There is nowhere in that card member agreement. And I'd submit there's nowhere in the change in terms agreement that Chase discloses we have a policy of adverse action repricing or that, hey, Mr. and Mrs. Barr, if your credit – if you have too many open lines of credit, we will review your report and we'll look at – to determine if you're at credit risk. It's completely silent. All right. And what are you relying on for that particular point, the failure to disclose point? Sure. We have TILA. We have the implementing reg. Okay. But what portion of TILA? Sure. The under 226.6a2. And specifically within that, I was just going to suggest, Your Honor, that meaning is derived when you look at Reg Z and thereafter the staff commentary. And I would – It must be resolved on Reg Z? And the staff commentary. And the staff commentary specifically, I'd guide Your Honor to Comment 11, which talks about penalty pricing. And it says if an initial rate is going to go up, you have to reveal that fact. You have to reveal the initial rate. You have to reveal the fact that there's a penalty price. But is there a difference between knowing that a rate is going to go up after, let's say, three months or six months or a year and failing to disclose that it's automatic, irrespective of anything that the customer does, and disclosing all of the circumstances, all of the permutations and combinations that might occur that might change the credit risk that a customer performs? Let me give you an example. Does Chase have to disclose that if it sees your name in the paper because you've been convicted of a felony, that it may decide that you're a higher credit risk? I don't think that it does, but I don't think TILA mandates that. There has to be, if you take the concept of TILA, but if you take your analysis, Your Honor, to its logical conclusion, the question is, what does a bank have to disclose? What terms of credit does it have to disclose? Where does it cut off that line? And TILA gives some guidance. TILA says there's something called penalty rates. And I'll draw the analogy, which I did to the court below. You have the universal default provision. How is that? Why is that being revealed to the bars? Simple. Because Chase says we have a policy whereby we'll look at your credit report to see if you defaulted on any other payment to any of your other creditors. If you did, we will reserve the right to increase you to a penalty rate. Why did Chase reveal that? And the card member agreed. Simple. They have to. It's a penalty rate. It's under 226.6a2. And the penalty rate provision, the staff commentary under Common 11 says if you have a penalty rate, you have to disclose the specific events on which they can be based. And, Your Honor, if I step back and take a 40,000-foot view of this, the logic is simple. Chase can provide credit on whatever terms it wants. We're in a competitive environment. They'll be the first to say that credit is a privilege. And we agree. It is a privilege. But at the same time, you have a bunch of people who are taking on their credit card, and it allows a company like a bank to exist. They have to meet halfway, and that's what TILA provides. You give us credit on whatever terms you want. Just let us know what it is so we can go out into the market and see if anyone can beat that. And look what the bars did. At 8.99 percent, they were happy to beat Chase Customs. At 24.74 percent, they were not, and they left. But they also knew of the 24 percent. They were given a notice of that. They were given a change-in-terms notice that said your new APR is 24 percent. And they were told that if they didn't like it for any reason, that they can get out. Well, there are two issues. One, there's a negative opt-out, which was they're sent a little letter at some point saying you have a new APR that's 24 percent. It's buried with a change-in-terms of arbitration, and it says also that you've got foreign currency, new changes. You know, that is fundamentally different. And, you know, mind you, Your Honor, Chase makes the point that you can opt out of it, but what's the result of that opt-out? They close your account. And if you read the card member agreement, once your account is closed, Chase reserves the right to demand payment instantly for the full amount by a specified date, or they'll assign you a penalty rate. But backing up one, we're not talking about whether they ultimately disclosed a new APR. We know they did in the change-in-terms. What they didn't disclose is this policy that exists that creates this new APR, which is critical. People have to know what terms of credit there are. It's fundamental to TILA. And so I think we understand your point on that. What about the arbitration clause? Assume just for the moment that we were persuaded to reverse. What's the application of the arbitration clause? Bless you, Your Honor. Your Honor, when we first brought this appeal, there was a difficulty with getting to Judge Hagerty's underlying order in this case. And it was not clear. Magistrate Hubel rendered a decision in the alternative, and that was either motion to dismiss. If you don't like the motion to dismiss, we suggest you compel arbitration. When we briefed this appeal, it wasn't clear to us which part of Magistrate Hubel's decision Judge Hagerty. Do we have jurisdiction on the arbitration issue? Honestly, Your Honor, I think it's not right. And it was based upon that occurrence, as I said, in the footnote we put in that we only got the opinion a day before our appellate brief was due. Well, again, suppose we were to reverse. What happens next? Well, if you were to reverse, I imagine the lower court would then ask for additional further briefing on it, and then the issue would be decided. And if I may, Your Honor. You're down to about two minutes. Thank you. You're welcome. We will hear now from Chase. Good morning, Your Honors. Nancy Thomas from Morrison & Forrester on behalf of Chase Bank. And I want to start by focusing on what this case is about, which Judge Bybee has already referred to, which is the dependence challenge and interest rate increase that was authorized by their customer agreement, that they received notice of two months in advance, and that they had the opportunity to reject, but they didn't do so. If here, when the appellants received notice in February of 2005, it gave them a choice, they could decide they wanted to continue borrowing new money from Chase, in which case a new interest rate would apply because there would be an amendment to the agreement, or they could reject the new interest rate, in which case they could pay off their existing balance, all of the money they'd already borrowed, in accordance with the existing term. There's no dispute that they decided that they wanted to continue borrowing from Chase, and so the new interest rate applied. The same document that notified them of the interest rate increase, which they obviously received and understood, that explains that they had the right to opt out by sending written notice. Counsel, if I were reading the original card member agreement here closely, which I don't think many of us actually do, but looking at ER pages 53 and 54, which is also labeled Exhibit E, pages 3 and 4 of 7, which is the finance charge section, I would have the impression that this is the entire universe of reasons why my rate could increase. And one reason is that it varies with the prime rate that the general, and that's obvious to people anyway, I would think, that as credit becomes more expensive, everybody's credit becomes more expensive. And then on the following page, there's a list of default rates and what events will trigger a higher interest rate. And what happened in this case is not in that list. Why isn't a person entitled to look at this and believe that this is the entire possible range of conduct for which an interest rate increase will happen? And isn't that misleading when there is something else that could be on this list and isn't? And, Your Honor, with all due respect, it's not misleading. There is nothing in this language of Section 4, which is about finance charges, that indicates these are the only reason that your interest rate will increase. And if you turn to the next page, in equally large print, it says, Changes to this agreement. That's on page 56. It specifically says- But is it a change to the agreement? The interest rate went up, but the policy that allowed the interest rate to go up was not new. In other words, if it would have been correct to place the policy at issue on page 4 in the list of default rates, it would have been true at the time of this card member agreement to add that into the list. And so why is that a change? Several responses, Your Honor. The first one is there is nothing in this record. You go back to the complaint. Now, on appeal, we are hearing about an adverse action repricing policy that existed since the time the bars opened their account. There's nothing in the complaint that refers to any such policy. Even if that weren't the case, there's no dispute here that what happened was an interest rate increase, a change to the preferred rate, the rate that was disclosed in this card member agreement- For what reason? Based on their credit history. Okay. And the credit history is not one of the things listed on page 4 under default rates. Yes, and, Your Honor, for that, you have to go to the disclosure requirements in TLF. Regulation Z does not state disclosed every reason you could possibly change a term in the agreement. In fact, it says just the opposite, which is that Chase may reserve the right to increase the interest rate. And, in fact, it expressly did so in the card member agreement. What about 226.6A2? Yes, 226A2, Your Honor, if you look at the language, what it says is, the circumstances under which a finance charge will be imposed and an explanation of how it will be determined as follows. Well, but the precursor is the creditor shall disclose to the consumer. Isn't that correct? The very first line, 226.6? But then it says each of the following items to the extent applicable. All right. A, the finance charge, the circumstances under which a finance charge will be imposed and an explanation of how it will be determined as follows. Okay. And there are four specific items listed there. Well, I'm specifically referring to the provision that counsel brought to our attention, which is A2. Yes. Disclosure of each periodic rate and so forth. When different rates apply to different types of transactions, the types of transactions to which the periodic rates shall be disclosed. That's right. And what this is is the disclosure of each periodic rate. That is the actual number. And here the actual number, which is an index and a margin, was disclosed. There's no dispute about that here. The range of balances to which it is applicable does not apply here, and that's in our papers. In the commentary to this section it specifically provides if it's the same periodic rate that applies to all of the balances, which was the case in the card member agreement, then the range of balances doesn't apply. And then it says, and the corresponding annual percentage rate. The annual percentage rate is, again, a number. It is the actual rate that will be applied. What you do is you take, for example, if the periodic rate is a daily interest rate, then you would multiply that by 365 to get the annual percentage rate. And in the portion of the card member agreement that Justice Graber was referring to, that's exactly what's disclosed there, which is the periodic rate and the corresponding annual percentage rate. In fact, I don't actually think it's in the card member agreement. It's in the rates and fees table that would have accompanied the card member agreement. Sotomayor, if this were an application rather than a card member agreement, wouldn't this have to be disclosed? No, Your Honor. The reason is solicitations or applications are governed by Section 226.5a. Right. And I agree with appellants that the language of Comment 11, which I want to get to, which responds directly to both your and Judge O'Scanlon's questions, is the same in both places, which is the only thing that Chase has to disclose in terms of the circumstances that could lead to a penalty rate or an increase in the rate are specific events. The language there is specific events. And the examples show that these are triggering events. And the receipt of an unfavorable credit report is an event. It is not, Your Honor. In fact, there is no such thing as an unfavorable credit report. Well, the receipt, leave out unfavorable. When you receive a credit report, that's an event. And, Your Honor, it's not. This is the specific event that may lead to an interest rating.  In fact, it says, the creditor must disclose specific event or events that may result in an increased rate. And the examples in the comment as to what are specific events illustrate that they are triggers, like a late payment or a late payment with some other creditor. Or actually, I think the other example is exceeding your credit limit. Here, it's very important. There is no triggering event. Well, if we disagree with you about that, do we get to disagreeing with you about the whole thing? In other words, the card member agreement, in fact, lists all the things you just described, even though they appear in another section of Regulation C. All those things are in the card member. All those things are in Section 4, but they are triggering specific events. Right. Here, what we're talking about is, and if you look at the letter that the borrowers received, it did not say, and it is not the case that Chase increases your interest rate for specific events in your credit report, such as if you have six open credit card accounts, that's too many, or if you have a specific debt, amount of outstanding debt. Isn't that what happened here? No, Your Honor. What happened here is the two reasons that are disclosed in the letter as alleged in the complaint are too much debt and too many open cards. And it's very important. Are you telling us that because they didn't put a number of open cards that it doesn't apply? Your Honor, in fact, I'm telling you it's because there is no number. There is no allegation here that there was a triggering event. What Chase does is look at the entire credit report. It's entirely semantic, though. It seems to me that it's totally within, I mean, everything, it seems to me, that you've said to us rises or falls on whether it's an event to receive information of a very particular type that causes Chase to increase the rate. And, Your Honor, the language there is particular for a reason, which is Chase and the OCC and the Federal Reserve have both recognized in authorizing these changes in terms that the credit card issuer must have the flexibility to be able to react to changing events. Part of that is risk-based pricing. And some of risk-based pricing is based on specific triggers, which are what's disclosed and what appellants have pointed out, like a late payment or exceeding your credit limit. But part of it is what we're seeing here, which is a very complicated review of every borrower's credit history. Isn't that an event? It is not an event. A review of credit history is not the reason, the specific event, that leads Chase to increase the interest rate. What it is is it is exactly what's set forth in the agreement, which is Chase will review your credit history. It does not limit why it will do that, and it specifically reserves the right to increase the card member's interest rate in the future. And the whole point of risk-based pricing here, Your Honors, and why it is important is that this way Chase can offer credit to higher-risk borrowers who might not get it otherwise, because it can tailor the interest rate to the borrower's particular circumstance. In addition, it allows Chase... No one is challenging that you can do that or that that makes sense. The entire challenge is whether you told people up front sufficiently how you would do that. And, Your Honors, the fact is that the only part of TILA that requires a disclosure, right? TILA says, and there's no dispute, that under Regulation Z, Chase can reserve the right to change the terms at any time for any reason, which it did here. The only very limited exception is specific events that could trigger an interest rate increase. There is nothing in this record that indicates that Chase's review of the credit history, that what it saw there were any kind of specific events. Rather, and in fact, if you look at the complaint, there's a long list of factors that the appellants allege Chase looks at in the credit history and in combination may use to decide to increase a card member's interest rate. The key point here, though, is what Chase does is weighs all of these factors and decides in combination whether or not there's an increased risk. Was there any... Did Chase... In putting all this balance, this algorithm, were there customers to which Chase would have said, okay, your risk isn't as high as the bearer, so we're only going to charge you 18%? Well, and in fact, there is a whole... My understanding is that there's a whole range of factors, there's a whole range of weights that apply to different... Are there ranges of interest rates? And there's a range... There's both a range of factors, a range of rates... Why isn't that covered by the latter part of that comment 11? If the penalty rate cannot be determined. So they've given you an example here. It said the creditor must disclose the specific event or event that may result in an increased rate, such as 22% APR if 60 days late. Right. Then it says if the penalty rate cannot be determined at the time disclosures are given, the creditor must provide an explanation of the specific event or events that may result in the increased rate. Why doesn't that section say... Why doesn't it require you to give a notice here in whatever this was, the section on page 5 of the agreement, ER 54, that said, look, if we find something in your credit history that doesn't make a lot of sense to us, we're going to reserve the right to raise your APR, and we'll give you notice when we do that. But that would not... I would argue, Your Honor, that not only is that not required by comment 11, it wouldn't satisfy comment 11. Comment 11 says tell the card member the specific event. No, but Judge, if I read you the rest of it, that's... And the rest of it still says if you don't... I don't understand that appellants contend here that Chase had to disclose the 27.74% that it actually raised the interest rate to, because I think they would concede that at the time Chase entered into the agreement, it didn't know that maximum rate. So it could not have disclosed that. But the last sentence that Your Honor just referred to says, if you know the specific events but you don't know the specific rate, fine. Tell the card member the specific events. But what if the events are we receive adverse information from Experian? But the issue is that's not a specific event. What's the point of this provision? It is to allow the card member to change their behavior, to affect their behavior, right? It is if you have a late payment with Chase or a late payment with somebody else. And if you have overextended yourself by getting a whole lot of other credit cards, that may matter to us. That's behavior that can be controlled if people know it. But, Your Honor, here there is nowhere, Chase doesn't say if you're overextended we're going to raise your rate or we may raise your rate. What they say is we're going to look at your credit profile. And there's nothing in the record here that indicates specific events such as how many or how much. And if Chase were to just disclose here if there's adverse credit information, then we may raise your rate. How is that disclosing the specific events? It's not. In addition, Chase said two things here in the card member agreement. It said we can look at your credit report at any time and we can raise your interest rate at any time. And if you look at those together, there's no reason a card member would not understand that Chase can use the credit report, can use adverse credit information in your example to increase their interest rate. Both of those are clearly disclosed in the card member agreement. So. Thank you, Counsel. Your time has expired. Oh, I'm sorry, Your Honor. Thank you very much. You're very welcome. Mr. Braun. Thank you, Your Honors. First, a number of points. One, I don't see, number one, there's no such thing as a triggering event. If you look at the language of 226.6A2, common 11, it talks about penalty rates. It doesn't even define a penalty rate. Surely you could see 8.99% that triples overnight is a penalty rate. With respect to this notion of triggering events, Chase provided the bars after they asked for a letter that had two sentences in it. It wasn't even two sentences. It was two clauses. Your credit increase was as a result of too many open lines of credit and that your credit-to-debt ratio was off. Your outstanding credit was too high. Why can't you disclose that? Why is that any different than, hey, we're going to look at your credit report for any default that you might have had with any other borrower? The bottom line is it's not different. And I'd also like to add one other point that we raised in our brief. If you look at the OCC, the Office of the Comptroller of Currency, they issued a letter in 2004 specifically raising this issue and specifically warning banks that you've got to disclose these kind of issues. And they noted that the bank has every right to manage their credit risk. I'm sorry. Is that in the record? It is. I mean, it certainly was. Can you give me the reference? Your Honor, I don't know if that was actually included as an excerpt of record. It is in our brief. It may not be in the record. It's not in our record. It's been cited in the brief. I don't know if the actual letter was reproduced as part of the excerpt of record, but I can give you the site. It is the OCC Advisory Letter, AL 2004-10, issued September 14, 2004. 2004-10. And the date was? September 14, 2004. My counsel was kind enough to provide me a Lexus site if you'd like. It's 2004 OCC CB Lexus 72. And respectfully, I think I am out of time, Your Honor. So unless there's further questions. One quick question. Certainly. I think I heard counsel suggest that this claim wasn't preserved in the complaint. Do you have a response to that? I don't know how it couldn't be. The complaint basically, what she said was we didn't call the name adverse action repricing. We didn't name that in the complaint. That's true. There's no terminology adverse action repricing. That is something we later discovered. But it doesn't mean that there's not a policy in place, whatever you might call it, that you can't reveal this information. And we delineated all the things that occurred to the bars. We just didn't call it by that specific. All right. Thank you, counsel. Thank you, Your Honor. The case just argued will be submitted for decision.
judges: O'scannlain, Graber, Bybee